LEWISTON - AUBURN SHOEWORKERS
PROTECTIVE ASSOCIATION
*vs.*
FEDERAL SHOE, INC.

Androscoggin.   Opinion, March 16, 1955.

*Frank W. Linnell,* for plaintiff.

*Alonzo Conant,* for defendant.

SITTING: WILLIAMSON, TIRRELL, WEBBER, BELIVEAU, TAPLEY, JJ. FELLOWS, C. J., did not sit.

TIRRELL, J. On report. This is an action to enforce an arbitration award. Plaintiff is an independent labor union acting as bargaining agent for approximately 3500 shoe workers. Defendant is an employer engaged in shoe manufacture and a party with other employers to a labor-management contract covering wages, hours and conditions of employment bargained with them by plaintiff. In March, 1953 a dispute arose concerning vacation pay of defendant's employees. Article XI of the basic contract provides as part of the grievance machinery:

> "STEP #4. In the event the grievance shall not have been satisfactorily adjusted within forty-eight (48) hours time after the initial conference under STEP #3, the matter shall be referred to arbitration, as hereinafter provided in Article XII."

Final submission to arbitration is provided as follows:

> "Article XII. ARBITRATION. Any grievance or disputes not adjusted by negotiations between the parties under the grievance procedure of this

Agreement may thereupon be submitted to arbitration at request of either party by written notice to the other before a Board of three arbitrators, one to be appointed by the Employer, one to be appointed by the Union, and a third impartial arbitrator to be chosen by the two.

Appointments by the Employer and the Union shall be made within five (5) working days after the date upon which the notice is given. In the event of the failure of the arbitrators chosen by the Employer and the Union respectively, to agree upon such a third arbitrator within five (5) days after their appointment, such third arbitrator shall be appointed by the American Arbitration Association, Boston, Massachusetts.

Arbitration hearings shall be held as promptly as possible and the decision of the arbitrators, or a majority of them, shall be rendered in writing within thirty (30) calendar days and shall be final and binding upon both parties to this Agreement. All expenses and fees reasonably incident to the services of any such third arbitrator shall be borne equally by the Employer and the Union."

Pursuant to these provisions the matter was submitted to arbitration. Mr. Frank W. Linnell, attorney for the Union, was named as its representative, and Mr. Benjamin E. Gordon, attorney for the Lewiston-Auburn Shoe Manufacturers Association, was named as arbitrator by defendant. These two agreed upon and named Mr. John J. Murray as the third and impartial member of the Board. The arbitrators first met on June 10, 1953, at which time a written submission to arbitration was prepared and executed as follows:

"MEMORANDUM OF AGREEMENT, made this tenth day of June, 1953, by and between FEDERAL SHOE, INC., a corporation duly created by law and having an established place of business at Lewiston, in the County of Androscoggin and State of Maine, and LEWISTON-AUBURN SHOE-

WORKERS PROTECTIVE ASSOCIATION, a corporation duly existing under the laws of the State of Maine, and having an established place of business at Auburn, in said County and State.

## W I T N E S S E T H :

WHEREAS a controversy is now existing between said Federal Shoe, Inc., and Lewiston-Auburn Shoeworkers Protective Association, arising out of the terms of a labor management contract in existence between said parties, dated August 21, 1950, as amended.

The question to be decided is whether or not any persons in the employ of Federal Shoe, Inc., between June 2, 1952 and May 29, 1953, are entitled to receive from Federal Shoe, Inc., vacation pay for the vacation period occurring in the year 1953, in accordance with the provisions of said contract.

NOW, THEREFORE, we, the undersigned, Federal Shoe, Inc. and Lewiston-Auburn Shoeworkers Protective Association, aforesaid, do hereby submit the said controversy for determination by a Board of Arbitration, to consist of John J. Murray of Boston, Massachusetts, as the impartial member, Benjamin E. Gordon of Boston, Massachusetts, chosen by the employer, and Frank W. Linnell of Auburn, Maine, chosen by the Union, and we do mutually agree that the award to be made by the Arbitrators, or any two of them, shall in all things by us and each of us, be well and faithfully kept and observed, and shall be final and binding upon both parties hereto.

IN WITNESS WHEREOF, the parties hereto have executed this agreement this day and year first above written.

FEDERAL SHOE, INC.
By DORT S. BIGG
*Vice-President*

## LEWISTON-AUBURN SHOEWORKERS PROTECTIVE ASSOCIATION
By MARK H. BURKE
*Secretary-Treasurer"*

Hearing was then held by the arbitrators at which Mr. Linnell, acting also in his capacity as attorney for the Union, presented its case, and Mr. Gordon, in his dual role as attorney for the Employer, presented its case. At the close of the hearing, the business agent of the Union suggested that he would be leaving on a vacation and requested a decision before his departure. Mr. Gordon stated that there was no hurry, that he desired to negotiate further, and the matter could wait until Mr. Burke returned from vacation. Mr. Burke returned on July 13, 1953, at which time Mr. Gordon expressed a further desire to negotiate. As a result of conversations that day, a meeting of the Board was arranged for July 15th. Both Mr. Burke and Mr. Linnell felt and understood that any delay was at Mr. Gordon's request and to afford him an opportunity to seek an amicable solution with Mr. Burke. On July 15th the terms of the final award were agreed upon by a majority of the arbitrators. Mr. Gordon was present at these deliberations and stated that he could not agree to the terms of the award and would therefore not be able to sign the written decision. When the award was fully decided upon, Mr. Gordon informed the president of the defendant company of the terms by telephone and then made one final effort looking to a compromise solution. This failing, Mr. Gordon suggested that the impartial arbitrator prepare a written draft of the award and send each arbitrator a copy. It was understood that only two arbitrators would sign the written award and that the matter would be handled by mail. On the following day, July 16th, each arbitrator received a telegram from defendant's president in these words:

"Re Federal Shoe, Inc. arbitration. We hereby withdraw from submission agreement and revoke

the authority of arbitrator John J. Murray to act in this matter.

Federal Shoe, Inc.

By Hyman Shockett, President."

A short time later a written award was prepared and signed, which after reciting the issues and respective contentions and discussing the reasoning employed by the majority of the arbitrators, contained the following decisive paragraph:

### "AWARD

Those employees who were on the payroll of the Company during the week ending March 21, 1953 and who had been employed by the employer for not less than six continuous months prior to May 20, 1953, and who have worked a minimum of 500 hours therein shall receive a vacation of one week with pay equal to 10/12th of 2% of his or her earnings for continuous period of his or her employment during the 12 month period immediately preceding May 20, 1953, provided such employees had not lost seniority rights under Article 13 D of COLLECTIVE BARGAINING AGREEMENT as above interpreted by this Board."

The issues appear to be three in number:

1. Did the award come too late?

2. Was the submission effectively revoked?

3. Was the award defective in not being signed by the arbitrators in the presence of one another?

The provision in the basic contract for a time limit of 30 days after hearing, within which award must be filed, was clearly waived. In fact, there is a strong indication that the session on July 15th was itself a hearing within the meaning of the contract. The parties were there as well as the arbitrators. Negotiations were carried on which, if suc-

cessful, would have altered the award. But even if that were not so, the conduct of Mr. Gordon acting as the attorney and agent for defendant as well as its arbitrator, induced the arbitrators to defer decision until after the expiration of 30 days from June 10th. Moreover, the conduct of defendant on July 15th is only consistent with waiver. Defendant and his agent were still participating in the arbitration and seeking to vary the award. There was no suggestion by them on July 15th that time had run out on the arbitration. We conclude that these parties, acting through their authorized agents, effectively waived the 30 day provision of Article XII of the basic agreement and by mutual agreement extended the time, as they had a perfect right to do. In the absence of a definite extended time limit, the arbitrators were bound to conclude their deliberations, arrive at an award and reduce the award to writing within a reasonable time after hearing, and this they did. The defendant cannot therefore avoid the award on the ground that it came too late.

But was the submission to arbitration effectively revoked before final award? We think not. The basic agreement called for a written award and in the absence of waiver, we do not think the award was final until it was reduced to writing and signed by a majority of the arbitrators. Before that could be done, the defendant had sought to revoke the arbitration by telegram. In ordinary commercial arbitration the common law has long recognized and upheld the right to revoke agreements to arbitrate at any time before final award. Although one may be sued for such unjustified revocation, the measure of damages is out of pocket expense in preparing for the arbitration hearing. *Call* v. *Hagar,* 69 Me. 521. In short, for the payment of a nominal sum, one need not respect his otherwise valid obligation. The doctrine of revocability seems to have had origin in an offhand remark of Lord Coke that arbitration agreements were of

their own nature revocable. Coke's great prestige gave rise to acceptance of his dictum which soon flourished as legal doctrine. The jealousy of courts for their jurisdiction prompted them to maintain and encourage the fiction. "No one has ever adequately explained just what there is in the nature of an agreement to arbitrate that makes it inherently revocable." 17 University of Chicago Law Review 233, 236 (The Enforcement of Labor Arbitration Agreements).

"Arbitration is a mode of adjusting disputes favored by the law, and is peculiarly appropriate in controversies like the one existing between these parties." *Cushing* v. *Babcock,* 38 Me. 452 at 455. This quotation had reference to commercial arbitration. The reasons for looking with favor on arbitration of disputes arising under labor-management contracts are far more compelling. As collective bargaining has gained increasing acceptance in the favorable climate of the past twenty years, it has become almost universal practice for unions and employers to insert in their contracts contractual obligations banning strikes and lock-outs and substituting therefor an orderly grievance machinery culminating in arbitration. Strikes and lock-outs always result in lost wages and curtailed production harmful to both employer and employee, and in addition they tend to have a seriously adverse effect upon the economic life of the community in which they occur. The public therefore has a real interest in the success of arbitration of labor-management disputes and sound public policy requires more than token acceptance of a speedy and effective substitute for economic warfare. Whether or not this public policy is so compelling as to require judicial decision that arbitration submission agreements under labor-management contracts are irrevocable, or whether the common law rule applicable to commercial arbitrations in this respect so controls in the labor-management field as to require legislation if irrevocability is to be accomplished, we need not decide here. We have no

hesitation in holding that under no circumstances will revo-. cation of the submission be effective when the revoking party fails to act in good faith. In the case before us, the defendant was participating fully in the arbitration pro-. ceedings, seeking by the offering of evidence and by negoti-. ation to obtain a favorable award. Only when the award had been finally determined and made known to defendant. and when defendant was aware that it was unfavorable to its contentions did defendant seek to revoke. We deem that it would be intolerable and grossly inequitable to permit a party to seek every possible advantage from arbitration procedure and then at the last moment, solely to avert an unfavorable decision which had been orally announced by a majority of the arbitrators, escape the result by arbitrary revocation of the submission. Such action under such cir-cumstances cannot be considered as taken in good faith. If permitted, it would effectively destroy and disrupt the griev-ance machinery which is so valuable to employers and em-ployees and so important to the public. In *Pittsburgh Union Stock Yards Co.* v. *Pittsburgh J. S. Yards Co.*, 309 Pa. 314, 163 Atl. 668, the court held that when a party to arbitration has discovered that the majority have determined the issue against him, it is not within his power at the last moment suddenly to give a notice of revocation and avert a result. And in *Commissioners of Montgomery County* v. *Carey*, 1 Ohio State Reports 463, the Commissioners were secretly informed of the conclusion of the majority of arbitrators at a time when an award had been substantially agreed upon but had not been made. Before the arbitrators had signed the award and delivered it to the parties, the Commissioners revoked their submission. The court said at 468:

> "To allow a revocation by one party at such a time, and under such circumstances, instead of ac-complishing the objectives of an arbitration law, the speedy and final adjustment of the contro-versies of parties, by a tribunal amicably con-

> stituted for that purpose, would make it a mere
> means of mischief, trickery, and fraud."

We therefore conclude that the revocation attempted here was not effective.

The basic agreement contained no requirement that the written award be signed by the arbitrators in the presence of each other. Where all the arbitrators participate in arriving at a decision which is known to all of them and the written award embodies that decision, there being no contractual requirement to the contrary, it is our opinion that there is no requirement that the written award be signed by the arbitrators in the presence of each other. Such would be quite contrary to the general and accepted practice as we understand it, especially in the field of labor-management arbitrations. Even if there had been such a contractual requirement, it would have been a technical one which the parties could waive, and upon the facts in this case would have been waived.

There is no suggestion that the award is vitiated by any fraud, prejudice or mistake on the part of the arbitrators. The arbitrators having properly heard the issues submitted to them and having seasonably filed their written award, the plaintiff is entitled to the benefit of it and its action sounding in assumpsit is appropriate as a vehicle of enforcement. *Conant* v. *Arsenault*, 118 Me. 281. Accordingly the entry will be,

> *Judgment for the plaintiff in the sum of $7,666.66 with interest from the date of the writ and costs.*